AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

FILED
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

for the

District of New Mexico

AUG 0 2 2021

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

2018 Nissan Armada 4WD, Vehicle Identification Number: JN8AY2NE0J9735009

)
)
)
)
)

Case No. 21-MR-1092

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
2018 Nissan Armada 4WD, Vehicle Identification Number: JN8AY2NE0J9735009

located in the _____ District of _____ New Mexico _____ , there is now concealed *(identify the person or describe the property to be seized)*:
2018 Nissan Armada 4WD, Vehicle Identification Number: JN8AY2NE0J9735009

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☐ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC 1343 | Fraud by wire, radio, or television |
| 18 USC 1344 | Bank fraud |
| 18 USC 1956 | Money laundering |

The application is based on these facts:
See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Jessica Wright, Special Agent, USSS
*Printed name and title*

*Telephonic!/9*
Sworn to before me and signed in my presence.
*and submitted via email*

Date: *August 2, 2021*

_____
*Judge's signature*

City and state: _____ Albuquerque, New Mexico _____

B. Paul Briones, US Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR NEW MEXICO

IN THE MATTER OF THE SEARCH OF:
1008 16TH STREET SW, RIO RANCHO, NEW
MEXICO, 87124

Case No. _____

## AFFIDAVIT IN SUPPORT OF A WARRANT
## TO SEARCH AND SEIZE

I, Jessica Wright, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a warrant to search the premises known as 1008 16th Street SW, Rio Rancho, New Mexico ("PREMISES") further described in Attachment A, for the things described in Attachment B, and in support of applications for warrants to seize property as described in Attachment B.

2.      I am a Special Agent with the U.S. Secret Service ("USSS"), and have been so employed since December 2018.  I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510 (7), in that I am an officer of the United States who is empowered by law to conduct investigations and make arrests for the offenses enumerated in Title 18 of the United States Code.

3.      I am currently assigned to the USSS Albuquerque Resident Office, tasked to investigate violations of federal law relating to financial crimes and the production, use and circulation of counterfeit United States currency.  I have had formal training relating to these investigations during my 32-week Criminal Investigation Training Program at the Federal Law Enforcement Training Center in Glynco, GA and Special Agent Training Course in Beltsville, Maryland.

4.      The statements contained in this affidavit are based in part on information provided to me by other law enforcement officers through their investigative efforts and by information provided by non-law enforcement witnesses.  In preparing this affidavit, I have conferred with other Special Agents and law enforcement officers, who share the opinions and conclusions stated herein.  I have personal knowledge of the following facts or have learned them from the sources described above.

5.      I am also relying upon my experience, training, and background as a Special Agent with the USSS in evaluating this information.  This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. §§ 1343 (wire fraud), 1344 (bank fraud), and 1956 (money laundering) have been committed, are being committed, and will be committed by Christina and Charles Joyner.  There is also probable cause to believe that evidence of these crimes, as described in Attachment B, will be located at the address described in Attachment A.

7.      Based on the facts set forth in this affidavit, certain property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461 because it constitutes proceeds of violations of 18 U.S.C. § 1343 (wire fraud) and 18 U.S.C § 1344 (bank fraud).  Additionally, the property is subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) as property involved in, or traceable to property involved in, violations of 18 U.S.C. § 1956 (money laundering).  Violations of 18 U.S.C. §§ 1343 and 1344 constitute underlying specified unlawful activities for the purpose of 18 U.S.C. § 1956.  Civil and criminal seizure warrants for vehicles 1-6 and equipment 7-9 may be issued pursuant to 18 USC § 981(b) and 21 USC § 853(e) & (f)

by 18 USC § 982(b)(1).  The property subject to forfeiture consists of Vehicle 1, a 2007

Fleetwood 38V motor home, Vehicle Identification Number (VIN): 4UZACJDC77CY27262,

Vehicle 2, a 2018 Nissan Armada 4WD, VIN: JN8AY2NE0J9735009, Vehicle 3, a 2016 Dodge

Challenger, VIN: 2C3CDZC9XGH335521, Vehicle 4, a 2015 CAN-AM Spyder, VIN:

2BXNABC46FV000197, Vehicle 5, a 2016 PJ B83 utility trailer, VIN: 4P5B83034G1251112,

Vehicle 6, a 2014 Polaris RZR-14, VIN: 4XAST1EA1EB206423, Equipment 7, a John Deere

5065E utility tractor, serial number: 1PY5065EJJJ403641, Equipment 8, John Deere 520M STD

farm loader, serial number: 1P0520MXLKD061398, Equipment 9, a Frontier Bucket AD11E-

72" GRPLBKT300CX/4&500, serial number: 1XFAD11EEK0001204.  I am requesting

warrants to seize these vehicles and pieces of equipment.

       8.     Further, there is probable cause to believe that Christina and Charles Joyner

deposited proceeds of wire fraud in their jointly held Mountain America Credit Union (MACU)

account 1527.  The facts in this affidavit establish probable cause to seize and commence

forfeiture of funds up to $1,452,561.92 in the Joyners' MACU account 1527 as proceeds of

violations of 18 U.S.C. § 1343 (wire fraud), pursuant to 18 U.S.C. § 981 (a)(1)(C) and 28 U.S.C.

§ 2461.  Pursuant to 18 U.S.C. § 984, money is fungible and the government may seek civil

forfeiture of identical property found in the same location.  I am requesting a warrant to seize

funds up to $1,452,561.92 from the Joyners' MACU account 1527.

## PROBABLE CAUSE

       9.     On 1/28/20, I communicated with T. Bryant with Mountain American Credit

Union (MACU) Fraud Department regarding MACU customers Christina and Charles Joyner,

who are husband and wife and are joint authorized signers on a MACU general membership

account, account ending in 1527.  Christina Joyner (hereinafter, "JOYNER") is a bookkeeper for

Quanz Motor Car Company, Inc.  Quanz Motor Car Company, Inc., dba Quanz Auto Body,

3

(hereinafter, "Quanz") has multiple locations in Albuquerque and Rio Rancho, New Mexico. JOYNER and Charles Joyner's (hereinafter, "C. JOYNER") MACU account receives regular ACH deposits from Quanz that are consistent with normal payroll deposits. However, JOYNER is depositing multiple checks per day via mobile deposit and ATM from Quanz. Following the check deposits, JOYNER will conduct a series of cash withdrawals either via ATM or in branch on the same day.

10.     In my training and experience, company checks outside of normal payroll checks written to an employee and signed by the same employee are not legitimate business payments. The amounts and frequency of the checks written to JOYNER each month are inconsistent with normal business practices for an employee holding her position. I have no reason to believe that JOYNER is an owner or debtholder for Quanz; even if she were, the pattern and manner of payments would be inconsistent with typical business practices.

11.     I will conduct an interview with Quanz and confirm JOYNER is not entitled to business checks outside of her normal payroll. I respectfully request that upon confirming the checks written to JOYNER and signed by JOYNER were unauthorized, the USSS will execute a search warrant at JOYNER's residence located at 1008 16th Street SW, Rio Rancho, NM 87124.

12.     MACU utilizes ProfitStars, whose headquarters is located at 1025 Central Expressway South, Allen, TX 75013-2790, to process mobile/remote deposits. Once a MACU member takes a picture of the check using the MACU application, the image is electronically transferred to ProfitStars, who then processes the information listed on the check. ProfitStars utilizes an electronic conversion to convert the printed text into machine-encoded text.

ProfitStars will notify MACU that the check has not been previously deposited and appears valid. MACU will act immediately and front the funds to the member's MACU account.

13.     On 1/29/20, I received an email from V. Baeza with MACU containing spreadsheets outlining JOYNER and C. JOYNER's MACU account number (account ending in 1527), dates, check amounts, description (ex. "via mobile banking"). Between 9/3/19 – 12/15/19, there were 277 check deposits from Quanz that total $138,949.84. Between 9/3/19 – 12/15/19, there were 183 cash withdrawals totaling $78,334.76. Ms. Baeza emailed a copy of a check image belonging to Quanz, dated 8/30/19, pay to the order of Chrissy Joyner, for $508.80. The check image listed New Mexico Bank and Trust, which is the bank Quanz utilizes for their business accounts. The authorized signer of the check is JOYNER. Ms. Baeza included a copy of page 1 of JOYNER and C. JOYNER's MACU general membership account "statement of account" date range, 9/1/19 – 9/30/19. This statement of account includes a mobile banking deposit, REF: 591407949, deposit by check, for $508.80.

14.     On 4/16/20, I obtained records from MACU regarding JOYNER and C. JOYNER's MACU bank account, account ending in 1527. On 4/30/20, I obtained records from New Mexico Bank and Trust regarding Quanz company bank accounts.

15.     I reviewed the check images provided by MACU and observed that the unauthorized check deposited into JOYNER and C. JOYNER's MACU account belonged to Quanz Motor Car Co., Inc. pay to the order of Chrissy Joyner, memo: "savings" and the checks were signed by "C Joyner." I also reviewed Quanz Motor Car Co., Inc. payroll account checks

issued to Christina M. Joyner that listed JOYNER's home address as 1008 16th Street SW, Rio Rancho, NM 87124.  See copy of unauthorized check image below:

16.     According to New Mexico Workforce Solutions, C. JOYNER's last reported New Mexico wages were in 2015 at the City of Rio Rancho, NM.

17.     I obtained tax records from New Mexico Taxation and Revenue. I reviewed JOYNER and C. JOYNER's joint reported personal income tax records and located the following information:

| Tax Year | Reported Gross Income |
|----------|----------------------|
| 2016 | $49,764.00 |
| 2017 | $48,884.00 |
| 2018 | $53,223.00 |
| 2019 | $56,440.00 |
| 2020 | $56,845.00. |

18.     After reviewing JOYNER and C. JOYNER's expenditures listed in their bank statements, MACU account ending in 1527, I located several cash withdrawals and several recurring expenditures to include but not limited to: PayPal, Bank of Albuquerque, Bank of

America, U.S Bank, Wells Fargo, JDF Webpay (John Deere Financial), SUI Stampin' Up, Sheffield Financial, Nissan, Ally Financial, Chrysler Capital and Capital One.

19.     I forwarded the MACU and New Mexico Bank and Trust records to Special Agent (SA) Daryl Aragon and Forensic Auditor Joshua Hoffman with New Mexico Taxation and Revenue for review and analysis.

20.     I received documents from SA Daryl Aragon and Forensic Auditor Joshua Hoffman containing a comprehensive review of JOYNER's unauthorized check deposits from Quanz to JOYNER and C. JOYNER's MACU account (account ending in 1527) from January 2016 – February 2020. The following information was compiled:

Payee: Chrissy Joyner

| Check Date (Year) | Amount |
|---|---|
| 2015 | $1,805.00 |
| 2016 | $139,207.22 |
| 2017 | $227,166.82 |
| 2018 | $250,436.40 |
| 2019 | $427,682.81 |
| 2020 | $55,514.45 |
| **Grand Total:** | **$1,101,812.70** |

21.     On 5/6/21, I obtained updated records from New Mexico Bank and Trust regarding Quanz company bank accounts.  On 5/11/21, I obtained updated records from MACU regarding JOYNER and C. JOYNER's MACU bank account, account ending in 1527.

22.     On 7/1/21, I forwarded the MACU and New Mexico Bank and Trust records to SA Daryl Aragon and Forensic Auditor Joshua Hoffman with New Mexico Taxation and

Revenue for review and updated analysis of the aforementioned MACU and New Mexico Bank and Trust records.

23.   On 7/15/21, I received documents from SA Daryl Aragon and Forensic Auditor Joshua Hoffman containing a comprehensive review of JOYNER's unauthorized check deposits from Quanz to JOYNER and C. JOYNER's MACU account (account ending in 1527) from February 2020 – April 2021.  The bank statements were analyzed and the below listed table was updated with the following information:

Payee: Chrissy Joyner

| Check Date (Year) | Amount |
|---|---|
| 2015 | $1,805.00 |
| 2016 | $139,207.22 |
| 2017 | $227,166.82 |
| 2018 | $250,436.40 |
| 2019 | $427,682.81 |
| 2020 | $333,415.43 |
| 2021 | $72,848.24 |
| **Grand Total:** | **$1,452,561.92** |

24.   I reviewed JOYNER and C. JOYNER's MACU "statement of account" statement date: 4/1/21 – 4/30/21, which listed Christina M. Joyner and Charles Joyner's address as 1008

16th Street SW, Rio Rancho, NM 87124-0888.  I reviewed the following Quanz unauthorized

checks, written out to: Chrissy Joyner, signed by "C Joyner" deposited into account ending 1527:

| Date | Description | Amount Deposited |
|---|---|---|
| 4/1/21 | Deposit by check | $534.78 |
| 4/1/21 | Deposit by check | $500.00 |
| 4/1/21 | Deposit by check | $563.08 |
| 4/5/21 | Deposit by check | $604.53 |
| 4/5/21 | Deposit by check | $586.92 |
| 4/6/21 | Deposit by check | $628.88 |
| 4/6/21 | Deposit by check | $566.11 |
| 4/6/21 | Deposit by check | $507.61 |
| 4/6/21 | Deposit by check | $505.27 |
| 4/10/21 | Deposit by check | $608.74 |
| 4/10/21 | Deposit by check | $508.64 |
| 4/10/21 | Deposit by check | $563.91 |
| 4/11/21 | Deposit by check | $500.00 |

| 4/11/21 | Deposit by check | $554.81 |
|---------|------------------|---------|
| 4/11/21 | Deposit by check | $508.60 |
| 4/11/21 | Deposit by check | $566.61 |
| 4/12/21 | Deposit by check | $458.63 |
| 4/12/21 | Deposit by check | $603.37 |
| 4/12/21 | Deposit by check | $613.77 |
| 4/12/21 | Deposit by check | $548.16 |
| 4/12/21 | Deposit by check | $602.48 |
| 4/15/21 | Deposit by check | $584.16 |
| 4/15/21 | Deposit by check | $509.47 |
| 4/15/21 | Deposit by check | $562.31 |
| 4/25/21 | Deposit by check | $603.34 |
| 4/25/21 | Deposit by check | $550.80 |
| 4/25/21 | Deposit by check | $526.37 |
| 4/25/21 | Deposit by check | $602.54 |
| 4/26/21 | Deposit by check | $526.44 |

| 4/26/21 | Deposit by check | $523.18 |
|---------|------------------|---------|
| 4/26/21 | Deposit by check | $566.38 |
| 4/29/21 | Deposit by check | $601.38 |
| 4/29/21 | Deposit by check | $548.57 |
| 4/29/21 | Deposit by check | $603.39 |
| 4/29/21 | Deposit by check | $565.89 |
| 4/30/21 | Deposit by check | $604.27 |
| 4/30/21 | Deposit by check | $532.69 |
| 4/30/21 | Deposit by check | $543.12 |
| **Total:** | | **$21,189.20** |

25.     According to JOYNER and C. JOYNER's statement of account, statement date: 4/1/21 – 4/30/21, the following information was listed:

a.  207 ATM withdrawals and other charges: $27,723.93

b.  9 ATM deposits and other credits: $15,250.00

c.  64 withdrawals and other charges: $17,657.87

d.  48 deposits and other credits: $33,451.00

26.     I conducted surveillance at 1008 16th Street SW, Rio Rancho, NM 87124, and observed several vehicles in the driveway to include a large brown motor home NM license plate # 43215RVB, a white Dodge Challenger NM license plate # 642WDC and a white Nissan

11

Armada NM license plate 117WHN.  I queried the aforementioned license plates using law enforcement databases; all vehicles are registered to Christina and Charles Joyner, 1008 16th Street SW, Rio Rancho, NM 87124.

27.      I received records from Ally Financial, which is one of the reoccurring expenditures listed in JOYNER and C. JOYNER's MACU account, account ending in 1527.  I reviewed the documents and located the following information, on Vehicle 1:

-   Buyer: Charles R Joyner

-   Co-buyer: Christina M Joyner

-   Contract Date: 10/11/13

-   Vehicle description: 2007 Fleetwood 38V motor home

-   VIN # 4UZACJDC77CY27262

-   Amount Financed: $83,671.37

-   Number of payments: 144

-   Amount of payment: $840.13

-   First payment due: 11/26/13

-   Total sale price: $146,754.99

-   Payment source: Bank Routing # 324079555, Account # ending in 1527

    (JOYNER and C. JOYNER'S MACU account)

-   Lien Holder: Ally Financial, Cockeysville, MD 21030

28.      I reviewed the Ally Financial expenditures from JOYNER and C. JOYNER's MACU account, account ending in 1527, from 2016 – 2021.  Below is a sample of the Ally Financial expenditures from JOYNER and C. JOYNER's MACU account:

| Date | Transaction Description | Amount |
|------|------------------------|--------|
| 2/27/20 | Ally Financial | $900.00 |

| 3/25/20 | Ally Financial | $840.13 |
|---------|----------------|---------|
| 4/27/20 | Ally Financial | $900.00 |
| 5/27/20 | Ally Financial | $840.13 |
| 6/25/20 | Ally Financial | $900.00 |
| 7/27/20 | Ally Financial | $900.00 |
| 8/24/20 | Ally Financial | $900.00 |
| 9/25/20 | Ally Financial | $900.00 |
| 10/27/20 | Ally Financial | $900.00 |
| 11/27/20 | Ally Financial | $900.00 |
| 12/28/20 | Ally Financial | $900.00 |
| 1/27/21 | Ally Financial | $900.00 |
| 2/26/21 | Ally Financial | $900.00 |
| 3/29/21 | Ally Financial | $900.00 |
| 4/27/21 | Ally Financial | $900.00 |

29.     I received records from Nissan, which is one of the reoccurring expenditures listed in JOYNER and C. JOYNER's MACU account, account ending in 1527.  I reviewed the documents and located the following information on Vehicle 2:

- Buyer: Charles Joyner

- Co-buyer: Christina Joyner

- Contract date:7/9/2018

- Vehicle description: 2018 Nissan Armada 4WD

- VIN: JN8AY2NE0J9735009

- Amount financed: $65,819.10

- Number of payments: 72

- Amount of payment: $1,120.07

- First payment due: 8/23/18

- Total sale price: $89,045.04

- Payment source: Bank Routing # 324079555, Account # ending in 1527

13

(JOYNER and C. JOYNER'S MACU membership account)

- Lien Holder: Nissan Motor Acceptance Corp.

30.     After reviewing JOYNER and C. JOYNER's Nissan application, C. JOYNER

listed his employer as Quanz, Occupation: Painter, Salary: $60,000/year, length of employment:

8 years, 1 month.  I reviewed JOYNER and C. JOYNER's MACU bank statements and observed

the following Quanz payroll deposits six months prior to the date of application (2/2018 –

7/2018):

| Date | Transaction Description | Amount |
|------|------------------------|--------|
| 2/8/18 | Quanz Motor Car Payroll | $1,926.66 |
| 2/22/18 | Quanz Motor Car Payroll | $1,714.62 |
| **Feb Total:** | | **$3,641.28** |
| 3/8/18 | Quanz Motor Car Payroll | $2,774.82 |
| 3/22/18 | Quanz Motor Car Payroll | $1,714.62 |
| **March Total:** | | **$4,489.44** |
| 4/5/18 | Quanz Motor Car Payroll | $1,714.62 |
| 4/19/18 | Quanz Motor Car Payroll | $1,708.23 |
| **April Total:** | | **$3,422.85** |
| 5/3/18 | Quanz Motor Car Payroll | $1,714.62 |
| 5/17/18 | Quanz Motor Car Payroll | $1,714.62 |
| 5/31/18 | Quanz Motor Car Payroll | $2,138.70 |
| **May Total:** | | **$5,567.94** |
| 6/14/18 | Quanz Motor Car Payroll | $1,688.74 |
| 6/28/18 | Quanz Motor Car Payroll | $1,688.74 |

14

| June Total: | | $3,377.48 |
|---|---|---|
| 7/12/18 | Quanz Motor Car Payroll | $1,688.74 |
| 7/26/18 | Quanz Motor Car Payroll | $1,688.74 |
| July Total: | | $3,377.48 |

31.     The above listed payroll deposits are inconsistent with JOYNER and C.

JOYNER's reported income on their Nissan application.

32.     I reviewed the Nissan Auto Loan expenditures from JOYNER and C. JOYNER's

MACU account, account ending in 1527 from 2018 – 2021.  Below is a sample of the Nissan

Auto Loan expenditures from JOYNER and C. JOYNER's MACU account:

| Date | Transaction Description | Amount |
|---|---|---|
| 2/24/20 | Nissan Auto Loan | $1,200.00 |
| 3/20/20 | Nissan Auto Loan | $1,200.00 |
| 4/24/20 | Nissan Auto Loan | $1,200.00 |
| 5/22/20 | Nissan Auto Loan | $1,200.00 |
| 6/19/20 | Nissan Auto Loan | $1,200.00 |
| 7/22/20 | Nissan Auto Loan | $1,200.00 |
| 8/21/20 | Nissan Auto Loan | $1,200.00 |
| 9/23/20 | Nissan Auto Loan | $1,200.00 |
| 10/20/20 | Nissan Auto Loan | $1,200.00 |
| 11/24/20 | Nissan Auto Loan | $1,200.00 |
| 12/22/20 | Nissan Auto Loan | $1,200.00 |
| 1/21/21 | Nissan Auto Loan | $1,200.00 |
| 2/23/21 | Nissan Auto Loan | $1,200.00 |
| 3/23/21 | Nissan Auto Loan | $1,200.00 |
| 4/26/21 | Nissan Auto Loan | $1,200.00 |

33.     I received records from Chrysler Capital, which is one of the reoccurring

expenditures listed in JOYNER and C. JOYNER's MACU account, account ending in 1527.  I

reviewed the documents and located the following information on Vehicle 3:

15

- Buyer: Charles Joyner

- Co-buyer: Chrissy Joyner

- Contract date:10/18/2017

- Vehicle description: 2016 Dodge Challenger

- VIN: 2C3CDZC9XGH335521

- Amount financed: $71,933.62

- Number of payments: 72

- Amount of payment: $1,194.82

- First payment due: 11/27/17

- Total sale price: $86,027.04

- Payment source: Bank Routing # 324079555, Account # ending in 1527

    (JOYNER and C. JOYNER's MACU membership account)

- Lien Holder: Chrysler Capital, Fort Worth, TX 76161-0272

34.     After reviewing JOYNER and C. JOYNER's Chrysler Capital application, C. JOYNER listed his employer as Quanz Auto Repair, occupation: Paint and Body Tech, Salary: $6,000/month.  JOYNER listed her employer as Quanz, occupation: Accountant, Salary: $7,500/month.  I reviewed JOYNER and C. JOYNER's MACU bank statements and observed the following Quanz payroll deposits six months prior to the date of application (5/2017 – 10/2017):

| Date | Transaction Description | Amount |
|------|------------------------|--------|
| 5/4/17 | Quanz Motor Car Payroll | $1,653.07 |
| 5/18/17 | Quanz Motor Car Payroll | $1,578.07 |
| **May Total:** | | **$$3,231.14** |

16

| 6/1/17 | Quanz Motor Car Payroll | $1,553.07 |
| 6/15/17 | Quanz Motor Car Payroll | $1,426.27 |
| 6/29/17 | Quanz Motor Car Payroll | $1,426.27 |
| **June Total:** | | **$4,405.61** |
| 7/13/17 | Quanz Motor Car Payroll | $2,439.09 |
| 7/27/17 | Quanz Motor Car Payroll | $1,426.27 |
| **July Total:** | | **$3,865.36** |
| 8/10/17 | Quanz Motor Car Payroll | $1,731.08 |
| 8/24/17 | Quanz Motor Car Payroll | $1,426.27 |
| **Aug Total:** | | **$3,157.35** |
| 9/7/17 | Quanz Motor Car Payroll | $1,526.27 |
| 9/21/17 | Quanz Motor Car Payroll | $1,448.69 |
| **Sept. Total:** | | **$2,974.96** |
| 10/5/17 | Quanz Motor Car Payroll | $1,298.69 |
| 10/19/17 | Quanz Motor Car Payroll | $1,476.27 |
| **Oct. Total:** | | **$2,774.96** |

35.     The above listed payroll deposits are inconsistent with JOYNER and C. JOYNER's reported income on their Chrysler Capital application.

36.     I reviewed the Chrysler Capital expenditures from JOYNER and C. JOYNER's MACU account, account ending in 1527 from 2017 – 2021.  Below is a sample of the Chrysler Capital expenditures from JOYNER and C. JOYNER's MACU account:

| Date | Transaction Description | Amount |
| --- | --- | --- |
| 3/25/20 | Chrysler Capital | $1,194.82 |

17

| 4/29/20 | Chrysler Capital | $1,250.00 |
|---------|------------------|-----------|
| 5/28/20 | Chrysler Capital | $1,250.00 |
| 6/26/20 | Chrysler Capital | $1,200.00 |
| 7/29/20 | Chrysler Capital | $1,200.00 |
| 8/28/20 | Chrysler Capital | $1,200.00 |
| 9/28/20 | Chrysler Capital | $1,200.00 |
| 10/28/20 | Chrysler Capital | $1,200.00 |
| 11/27/20 | Chrysler Capital | $1,200.00 |
| 12/24/20 | Chrysler Capital | $1,200.00 |
| 1/29/21 | Chrysler Capital | $1,200.00 |
| 2/26/21 | Chrysler Capital | $1,200.00 |
| 3/29/21 | Chrysler Capital | $1,200.00 |
| 4/28/21 | Chrysler Capital | $1,200.00 |

37.     I received records from Sheffield Financial, which is one of the reoccurring expenditures listed in JOYNER and C. JOYNER's MACU account, account ending in 1527.  I reviewed the documents and located the following information on Vehicles 4 and 5:

**Sheffield account # 11 683619 2**

- Buyer: Charles Joyner

- Co-buyer: Christina Joyner

- Contract date: 2/6/2016

- Vehicle description: 2015 CAN-AM G7FB red/white Motorcycle (MC)

- VIN: 2BXNABC46FV000197

- Amount financed: $25,466.46

- Number of payments: 84

- Amount of payment: $396.05

- First payment due: 3/12/16

- Total sale price: $25,466.46

- Payment source: Bank Routing # 324079555, Account # ending in 1527

18

- Lien Holder: Sheffield Financial, Clemmons, NC 27012

**Sheffield account # 11 749180 0**

- Buyer: Charles Joyner

- Co-Buyer: N/A

- Contract Date: 3/4/2016

- Vehicle Description: 2016 PJ B83 UT Trailer

- VIN: 4P5B83034G1251112

- Amount Financed: $8,272.00

- Number of payments: 60

- Amount of payment: $161.00

- First payment due: 5/13/2016

- Total sale price: $8,272.00

- Payment source: Bank routing # 324079555, Account # ending in 1527

- Lien Holder: Sheffield Financial, Clemmons, NC 27012

38.     I reviewed the Sheffield Financial expenditures from JOYNER and C. JOYNER's

MACU account, account ending in 1527 from 2016 – 2021.  Below is a sample of the Sheffield

Financial expenditures from JOYNER and C. JOYNER's MACU account:

| Date | Transaction Description | Amount |
|------|------------------------|--------|
| 2/13/20 | Sheffield Financial | $400.00 |
| 2/13/20 | Sheffield Financial | $200.00 |
| 3/13/20 | Sheffield Financial | $396.05 |
| 3/13/20 | Sheffield Financial | $161.00 |
| 4/14/20 | Sheffield Financial | $396.05 |
| 5/12/20 | Sheffield Financial | $400.00 |
| 5/12/20 | Sheffield Financial | $200.00 |
| 6/11/20 | Sheffield Financial | $396.05 |
| 6/11/20 | Sheffield Financial | $161.00 |

19

| 7/15/20 | Sheffield Financial | $400.00 |
|---------|---------------------|---------|
| 7/15/20 | Sheffield Financial | $200.00 |
| 8/11/20 | Sheffield Financial | $400.00 |
| 8/11/20 | Sheffield Financial | $200.00 |
| 9/11/20 | Sheffield Financial | $396.05 |
| 9/11/20 | Sheffield Financial | $161.00 |
| 10/13/20 | Sheffield Financial | $396.05 |
| 10/13/20 | Sheffield Financial | $161.00 |
| 11/12/20 | Sheffield Financial | $400.00 |
| 11/12/20 | Sheffield Financial | $169.21 |
| 12/9/20 | Sheffield Financial | $400.00 |
| 1/13/21 | Sheffield Financial | $400.00 |
| 2/12/21 | Sheffield Financial | $425.00 |
| 3/9/21 | Sheffield Financial | $400.00 |
| 4/13/21 | Sheffield Financial | $400.00 |

39.     I received records from Capital One, which is one of the reoccurring expenditures listed in JOYNER and C. JOYNER's MACU, account, account ending in 1527. I reviewed the documents and located the following information on Vehicle 6:

- Buyer: Christina Joyner

- Contract Date: 5/17/14

- Vehicle description: 2014 Polaris RZR-14, 1000XP, Black Pearl

- VIN # 4XAST1EA1EB206423

- Amount Financed: $0

- Amount of payment: $359.00

- First payment due: 7/8/14

- Total down payment: $18,200.00

40.     I reviewed the Capital One expenditures from JOYNER and C. JOYNER's MACU account, account ending in 1527 from 2016 – 2021. Below is a sample of the Capital One expenditures from JOYNER and C. JOYNER's MACU account:

20

| Date | Transaction Description | Amount |
|------|------------------------|--------|
| 2/8/18 | Capital One | $400.00 |
| 3/5/18 | Capital One | $400.00 |
| 4/5/18 | Capital One | $400.00 |
| 5/4/18 | Capital One | $400.00 |
| 6/8/18 | Capital One | $400.00 |
| 7/9/18 | Capital One | $425.00 |
| 8/9/18 | Capital One | $400.00 |
| 9/7/18 | Capital One | $400.00 |
| 10/9/18 | Capital One | $400.00 |
| 11/9/18 | Capital One | $400.00 |
| 12/5/18 | Capital One | $500.00 |
| 1/8/19 | Capital One | $400.00 |
| 2/8/19 | Capital One | $400.00 |
| 379/19 | Capital One | $400.00 |
| 4/10/19 | Capital One | $542.46 |

41.    I received records from John Deere Financial (JDF), which is one of the

reoccurring expenditures listed in JOYNER and C. JOYNER's MACU account, account ending

in 1527.  I reviewed the documents and located the following information on Equipment 7, 8 and

9:

- Buyer: Charles Joyner

- Contract date:1/6/2020

- Equipment description #7: John Deere 5065E Utility Tractor

21

- Equipment #7 serial #: 1PY5065EJJJ403641

- Equipment description #8: John Deere 520M STD Farm Loader

- Equipment #8 serial #: 1P0520MXLKD061398

- Equipment description #9: Frontier AD11E-72"GRPLBKT300CX/4&500

- Equipment #9 serial #: 1XFAD11EEK0001204

- Amount financed: $53,570.42

- Number of payments: 59

- Amount of payment: $892.85

- First payment due: 2/6/2020

- Total Trade In: $7,845.64

- Total sale price: $53,570.42

- Payment source: Bank Routing # 324079555, Account # ending in 1527

  (JOYNER and C. JOYNER's MACU membership account)

- Lien Holder: John Deere Financial, Johnston, IA 50131-6600

42.    I reviewed the JDF expenditures from JOYNER and C. JOYNER's MACU account, account ending in 1527 from 2016 – 2021.  Below is a sample of the JDF expenditures from JOYNER and C. JOYNER's MACU account:

| Date | Transaction Description | Amount |
|------|------------------------|--------|
| 2/5/20 | JDF Webpay | $900.00 |
| 2/5/20 | JDF Webpay | $200.00 |
| 3/6/20 | JDF Webpay | $107.09 |
| 3/6/20 | JDF Webpay | $885.70 |
| 4/7/20 | JDF Webpay | $107.09 |

22

| 4/7/20 | JDF Webpay | $892.85 |
|--------|-----------|---------|
| 5/5/20 | JDF Webpay | $892.85 |
| 6/8/20 | JDF Webpay | $892.85 |
| 7/7/20 | JDF Webpay | $892.85 |
| 8/6/20 | JDF Webpay | $892.85 |
| 9/4/20 | JDF Webpay | $900.00 |
| 10/6/20 | JDF Webpay | $900.00 |
| 11/6/20 | JDF Webpay | $900.00 |
| 12/4/20 | JDF Webpay | $871.40 |
| 1/6/21 | JDF Webpay | $892.85 |
| 2/3/21 | JDF Webpay | $900.00 |
| 3/5/21 | JDF Webpay | $900.00 |
| 4/6/21 | JDF Webpay | $900.00 |

43.     There is probable cause to believe that Vehicles 1–6 and Equipment 7–9 constitute or derive from proceeds of unauthorized Quanz check deposits into JOYNER and C. JOYNER's joint MACU account, account ending in 1527 for the following reasons:

44.     From 2015 – 2021, JOYNER has written unauthorized Quanz company checks to herself totaling $1,452,561.92.  JOYNER deposits multiple checks per day via mobile deposit and ATM.  These checks are deposited into JOYNER and C. JOYNER's MACU account, account-ending 1527.

45.     C. JOYNER's last reported wages were in 2015 from the City of Rio Rancho. JOYNER and C. JOYNER's joint filed personal income taxes in 2020 were $56,845.00.

23

46.     Recurring expenditures from the MACU account have been directed to lien holders for each of Vehicles 1–6 and Equipment 7–9.

47.     Because funds were directed to lien holders out of the MACU account, the actual source of the funds-the fraudulent checks that JOYNER wrote to herself were concealed from the lien holders.

48.     Surveillance at JOYNER and C. JOYNER's residence places Vehicles 1, 2 and 3 at the residence and the property has a garage and several structures that could fit Vehicles 4, 5, 6 and Equipment 7, 8 and 9.

49.     In my training and experience, I know that it is common for people to maintain financial documents and records to include but not limited to bank statements, credit card statements, loan documents, bills, receipts, in either paper form or electronically stored on cellphones, computers or other storage mediums at their residence.  Most people possess cellphones and computers and therefore utilize cellphones or computers to use mobile or online banking as a way to access their accounts.[1]  People commonly download mobile banking apps to manage and access their bank accounts.  People download applications on their electronic devices to conduct transactions via online applications.  Online applications such as online payment systems, for example, PayPal, Venmo or Zelle are common applications used as a method of payment in comparison to the traditional paper methods such as checks or money orders.  People can download the aforementioned payment systems to their personal electronic devices as a faster, safer way to send money, make an online payment, receive money or set up a merchant account.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

---

[1] Indeed, records from MACU support the conclusion that JOYNER made numerous mobile check deposits using at least one device.

50.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

51.     *Probable cause.* I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records may be stored on that computer or storage medium, for at least the following reasons:

    a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

    b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

    c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer

has been used, what it has been used for, and who has used it. To give a few

examples, this forensic evidence can take the form of operating system

configurations, artifacts from operating system or application operation, file

system data structures, and virtual memory "swap" or paging files. Computer

users typically do not erase or delete this evidence, because special software is

typically required for that task. However, it is technically possible to delete this

information.

   d. Similarly, files that have been viewed via the Internet are sometimes

      automatically downloaded into a temporary Internet directory or "cache."

52.   *Forensic evidence.* As further described in Attachment B, this application seeks

permission to locate not only computer files that might serve as direct evidence of the crimes

described on the warrant, but also for forensic electronic evidence that establishes how

computers were used, the purpose of their use, who used them, and when. There is probable

cause to believe that this forensic electronic evidence will be on any storage medium in the

PREMISES because:

   a. Data on the storage medium can provide evidence of a file that was once on the

      storage medium but has since been deleted or edited, or of a deleted portion of a

      file (such as a paragraph that has been deleted from a word processing file).

      Virtual memory paging systems can leave traces of information on the storage

      medium that show what tasks and processes were recently active. Web browsers,

      e-mail programs, and chat programs store configuration information on the

      storage medium that can reveal information such as online nicknames and

      passwords. Operating systems can record additional information, such as the

attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.  Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the

27

computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

53. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

29

a. The time required for an examination.  As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable.  As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

54.     *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying

storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

55.    Based on the aforementioned information and investigation, I submit that this affidavit supports probable cause for a warrant to search the PREMISES described in Attachment A and seize the items described in Attachment B.

Respectfully submitted,

Jessica Wright
Special Agent
USSS

Submitted electronically and sworn telephonically on *August 2, 2021*:

UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### DESCRIPTION OF PREMISES TO BE SEARCHED

1. 1008 16th Street SW, Rio Rancho, New Mexico, 87124 is a brown stucco single story – single family residence located on the east side of 16th Street SW. The residence has a pitched roof with a two-car garage door that is green in color. Multiple vehicles to include a large recreational vehicle are parked in front of the residence. A large tan portable storage unit is located in front of the garage. Two large tan workshop-sized outbuildings are located in the backyard on the north side of the property. Another large tan workshop-sized outbuilding is located in the backyard on the south side of the property. This outbuilding has a camera security system affixed to the outside of the building facing north. Two large trailers, one white trailer, one tan trailer is located in the backyard on the east side of the property.

2. The vehicles, recreational vehicle, dumpsters and storage units whether locked or unlocked located on the property or curtilage of 1008 16th Street SW, Rio Rancho, New Mexico, 87124, including in the garage and outbuildings.







**Attachment B**

**DESCRIPTION OF EVIDENCE AND FORFEITABLE PROPERTY
TO BE SEARCHED FOR AND SEIZED**

1. Records or indicia showing occupancy, residency, and/or ownership of the property being searched and described within;

2. Currency;

3. Proceeds or an unlawful bank or wire scheme, or evidence of the acquisition or disposition of such proceeds;

4. Vehicles that have been obtained through an unlawful bank or wire fraud scheme;

5. Vehicle registration information and other indicators of vehicle possession including but not limited to state registrations, titles, dealership registration forms, vehicle identification numbers, insurance forms, liens, release of liens, keys;

6. The following vehicles and any associated records including title and registration documents:

   Vehicle 1: 2007 Fleetwood motor home, Vehicle Identification Number (VIN):

   4UZACJDC77CY27262;

   Vehicle 2: 2018 Nissan Armada, VIN: JN8AY2NE0J9735009;

   Vehicle 3: 2016 Dodge Challenger, VIN: 2C3CDZC9XGH335521;

   Vehicle 4: 2015 CAN-AM Spyder, VIN: 2BXNABC46FV000197; and

   Vehicle 5: 2016 PJ B83 utility trailer, VIN: 4P5B83034G1251112;

   Vehicle 6: 2014 Polaris RZR-14, VIN: 4XAST1EA1EB206423

   Equipment 7: John Deere 5065E utility tractor, SN: 1PY5065EJJJ403641

   Equipment 8: John Deere 520M STD farm loader, SN: 1P0520MXLKD061398

   Equipment 9: Frontier Bucket AD11E-72" GRPLBKT300CX/4&500, SN:

   1XFAD11EEK0001204

7. Financial institution records: including but not limited to applications, financial statements, loan collateral, credit and background investigations, loan agreements, notes or mortgages, contracts, checks, repayment records, records of liens or release of liens, correspondence files and bank memoranda.

8. Any records, receipts or financial documents of purchased goods or other various expenditures obtained through unlawful bank or wire fraud scheme;

9. Funds up to $1,452,561.92 from Christina Joyner and Charles Joyner's Mountain America Credit Union account ending in 1527; and

10. Computers, laptop computers, cellphones, thumb drives, hard drives or other electronic storage medium or storage media; and

The term "computer" includes all types of electronic, magnetic, optical, electrochemical or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware.

The term "cellphone" includes any portable telephone that can make and receive calls over a radio frequency link while the user is moving within a telephone service area. The radio frequency link establishes a connection to the switching systems of a mobile phone operator, which provides access to the public switched telephone network. Modern mobile telephones services use a cellular network architecture.

The term "thumb drive" or often referred to as "USB flash drive," is a data storage device that includes flash memory with an integrated USB interface. It is typically removable, rewritable and much smaller than an optical disc.

The term "hard drive" is an electro-mechanical data storage device that stores and retrieves digital data using magnetic storage and one or more rigid rapidly rotating platters coated with magnetic material.

The term "storage medium" or "storage media" include any physical object upon which computer data can be recorded. Examples include: hard disks, RAM, floppy disks, flash memory, CD-ROMS, and other magnetic or optical media.